IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| WANDA G. STRICKLAND, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | )   CASE NO. 5:08-CV-0737-KOB |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of the Social, | ) |
| Security Administration | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

**I. Introduction**

The claimant, Wanda G. Strickland, protectively filed an application for Disability Insurance benefits under Title II of the Social Security Act on September 16, 2005, stating that she became disabled on July 26, 2005, caused by chronic pain, depression, and fibromyalgia. The Commissioner denied the claims. The claimant filed a timely request for a hearing before an Administrative Law Judge. The ALJ held a hearing on March 13, 2007, in Decatur, Alabama. In a decision dated April 9, 2007, the ALJ denied an award of benefits after finding that the claimant was not disabled under sections 216(I) and 223(d) of the Social Security Act and therefore was not eligible for benefits. The claimant timely appealed the ALJ's decision to the Appeals Council, which denied her claim for review on February 27, 2008. The Appeals Council's denial made the ALJ's ruling final, and the claimant has therefore exhausted her administrative remedies. The claim is now ripe for review by this court and jurisdiction is proper under 42 U.S.C. § 405(g). For the reasons stated below, this court REMANDS the

Commissioner's decision pursuant to sentence six of 42 U.S.C. § 405(g) for further consideration.

## II. Issues Presented

In this appeal, the claimant alleges that the Commissioner erred in three ways. First, the claimant alleges that the ALJ failed to find that the claimant's chronic depression was severe. Secondly, the claimant alleges that the ALJ failed to properly consider the claim under the Eleventh Circuit's pain standard. Lastly, the claimant alleges that the ALJ never considered her lateral disc protrusion under the listing for spinal disorders.

## III. Standard of Review

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 401 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the

[Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

## IV. Legal Standard

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above question leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

Because the claimant alleges that one of her disabling conditions is pain**,** the ALJ should apply the Eleventh Circuit pain standard in determining whether the claimant is disabled by pain. *See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). The pain standard requires:

> (1) evidence of an underlying medical condition *and either*
> (2) objective medical evidence that confirms the severity of the

>alleged pain arising from that condition; *or*,
>(3) that the objectively determined medical condition is of such a
>severity that it can be reasonably expected to give rise to the
>alleged pain.

*Id*. (emphasis added).  While a reversal is warranted if the ALJ's decision contains no evidence of the proper application of the three-part pain standard, the ALJ does not have to recite the pain standard word-for-word.  *Id*.  Instead, the ALJ may make findings that indicate that he applied the standard.  *Id.*

## V. Facts

The claimant, a former nursing home orderly and manufacturing worker, was 54 years old on the date of her hearing, March 13, 2007.  She filed for a period of disability beginning July 26, 2004, claiming that she was disabled by anxiety/depression, fibromyalgia, arthritis, pain, and bulging disks.  The claimant is married, and her husband worked full-time as of the date of the hearing. (R. 233).

The claimant saw Dr. Freeman, her internist and treating physician, in March 2005 when she presented complaining of back pain. (R. 135).  He noted that the claimant had no areas of significant tenderness on that visit.  He also noted that she was "not able to work because of her intense achiness," and that she had restless leg symptoms. (R. 135-37).  Dr. Freeman referred the claimant to Dr. Hunt, a rheumatologist, and she saw Dr. Hunt in August 2005. (R. 199).

Dr. Hunt found that the MCPs of both hands were 1+ tender; her dorsal neck muscles, trapezii, and paraspinous muscles were also tender.  *Id*.  He also noted that she had a history of left carpal tunnel release with some residual symptomology, muscle pattern headaches, and knee pain.  *Id*.  In addition, Dr. Hunt found that the claimant had generalized myalgias and arthralgias

with features of fibromyalgia. *Id*. He recommended that she begin exercising regularly. *Id*.

Dr. Freeman noted in September 2005 that the claimant had seen Dr. Hunt, who thought she had fibromyalgia. (R. 138). Dr. Freeman added that he was starting her on Cymbalta and Ambien for her sleeplessness. *Id*. She returned to Dr. Hunt in October 2005, reporting that the fibromyalgia was under control, that she had started exercising, and that Ambien was helping her sleep, though she continued to have some difficulty sleeping. (R. 196). He prescribed Flexeril for the fibromyalgia. *Id*. The claimant visited Dr. Freeman in November 2005 complaining of headache, and Dr. Freeman noted that these headache symptoms did not present like the claimant's migraines did. (R. 135).

In December 2005, the claimant saw Dr. Gandhi, an internist, for a physical examination pursuant to her disability claim. (R. 107-08). She alleged muscle ache and fatigue that progressively worsened in March 2002 and remained bad through the date of the visit. She also reported crying spells, feelings of hopelessness, and helplessness. (R. 107). Further, the claimant reported tenderness in the neck, shoulder, shoulder blade, lower back, both arms, forearm, and legs. *Id*. She also claimed that sitting or standing for thirty minutes to an hour made her aches worse. *Id*. He noted that the claimant had some limited range of motion of her lower spine but that otherwise her range of motion was normal, including in the hips, shoulder, and cervical spine. *Id*. She exhibited mild to moderate lumbar muscle tenderness, and her straight leg raising was positive at sixty-five to seventy degrees. *Id.* The claimant could stoop and squat but said she it made her lower back pain increase. *Id*.

Dr. Gandhi also reported that the claimant showed trigger point muscle tenderness in her shoulders anteriorly, posteriorly shoulder blades bilaterally, lower lumbar spine bilaterally, in her

thigh muscles, above and below the knee joints, and with some tender trigger spots in both forearms. (R. 107). The claimant told Dr. Gandhi that her back pain sometimes radiated down to her right knee. *Id*. Dr. Gandhi diagnosed moderately severe fibromyalgia with multiple trigger tender spots, hypertension under fair control, reflux esophagitis, chronic depression, and hypothyroidism. (R. 107-08).

Also in December 2005, a state medical agency consultant completed a mental health evaluation on the claimant. (R. 111-23). The consultant found that the claimant suffered from depression, but that it did not cause any functional restrictions, and that any function restrictions she had were related to physical complaints, not her depression. (R. 123).

In February 2006, Dr. Hunt reported that the claimant continued to have good control of the fibromyalgia and the Ambien was still helping her sleep. (R. 194). She had some slight discomfort in her muscles but could do all necessary ADLs and was still exercising. *Id*. The claimant also said she had slight discomfort in her fibrositis trigger points, but without active synovitis in her peripheral joints. *Id*.

Dr. Freeman saw the claimant in May 2006, and she was complaining of back and right knee pain. (R. 133). An MRI taken in May 2006 of the claimant's spine showed a mild broad-based disk bulge of L5-S1 without significant herniation, stenosis, or central canal narrowing; a lateral osteophyte at the peripheral margin of the vertebral body on the left at L1-2 with some foraminal stenosis and lateral recess stenosis; and mild disk degeneration of the thoracic spine at T11-12 without a significant spinal stenosis. (R. 169).

In June 2006, she returned to see Dr. Hunt, complaining that her fibromyalgia was worse and reporting lumbar discomfort. (R. 193). He found two bulges that were unresponsive to

injection. *Id*. He told her to get an epidural injection for the pain and to call him so that he could increase the Flexeril if the injection did not work. *Id*. Also in June 2006, the claimant got an epidural injection for back pain, and she told Dr. Hunt that it did not work. (R. 202).

In October 2006, the claimant called Dr. Freeman, complaining of anxiety and panic attacks, which were related to her husband's recent cancer diagnosis. (R. 209). He told the claimant to take a half to a whole 0.25 mg Xanax on an as-needed basis. *Id*. The claimant returned to see Dr. Hunt in November 2006, reporting that she was having trouble sleeping despite increasing Flexeril and Ambien, and she had not been exercising. (R. 204). He told her to begin a regimen of stretching exercises and to return in four months if she did not experience problems. *Id.* The claimant then saw Dr. Freeman, also in November, and reported problems with fibromyalgia. (R. 205). She told Dr. Freeman that she did not plan to return to Dr. Hunt because the drive to his office in Huntsville was too far and she did not feel that she could drive there safely; he prescribed her methadone and told her to return in two months. (R. 207-08).

In April 2007, following the ALJ's decision, the claimant had a lumbar spine CT at Cullman Regional Medical Center. (R. 215-16). The radiologist reported normal spinal alignment, unremarkable paravertebral soft tissues, degenerative changes involving the L2-3 level, and unremarkable visualized nerve roots. (R. 216). Further, the L3-4 level had a left lateral disk protrusion that effaced the thecal sac and filled the nerve root. *Id*.

Records from Dr. Freeman at Cullman Primary Care dated April 2, 2007, show that the claimant continued to complain of back pain, fibromyalgia, depression, insomnia, and two herniated disks. (R. 222). Dr. Fuller, an osteopathic practitioner, saw the claimant on April 4, 2007. (R. 218-220). His records show that the claimant still had lumbar radicular pain with

bilateral lower extremity symptoms in the absence of L4 reflex. (R. 218). Dr. Freeman's records from the claimant's April 20, 2007 visit report that the claimant cannot stay in any position for more than fifteen minutes, and that she is "not currently working secondary to her pain and frequent positional changes." (R. 220).

At her March 13, 2007, hearing, the claimant testified that her severe impairments were fibromyalgia, bulging disks, and arthritis in her back. (R. 228). She said that her fibromyalgia symptoms include achy feelings that are flu-like, chronic fatigue, pain in her shoulders up into the back of her neck, and pain in her hips and legs. *Id.* She added that she is almost always aching. *Id*. She testified that she can only lift five to ten pounds at a time, that she can stand for fifteen to twenty minutes without pain, that she has problems sitting because she has to reposition herself often because of her back pain, and she could walk for about a mile on a good day and for fifteen or twenty minutes on a bad day. (R. 228-29). The claimant said that she rarely has a good day. (R. 229). She also has problems sleeping and staying asleep, will get up during the night, and during the day will have to lie on a heating pad for her pain. (R. 229-30).

As far as treatment for her back problems, the claimant testified that she had some epidural blocks that did not help, and that her back pain radiates into her legs and hips, especially her right leg and hip. This radial pain is different from her fibromyalgia pain. On a normal day, she says she gets up, has coffee, takes her thyroid medication, does some of the flexing muscle exercises for her stiffness, eats breakfast, takes other medications, and sometimes she does laundry. On occasion, she will also do some other housework. She will sometimes cook, but she usually will use the microwave or another quick method of cooking. (R. 230-31).

The claimant testified that she does drive, but she has panic attacks in heavy traffic where

she feels like she is suffocating and her heart races. She will also have panic attacks when she is in large groups of people or if she gets stressed.. The claimant further testified that she cries when her depression is really bad and during these periods "the smallest thing will set [her] off." (R. 231). She also reported feeling blue and wanting to be alone when depressed. She testified that she has anxiety attacks at least once a month, and she takes medicine for anxiety daily. (R. 232).

The ALJ found that the claimant has not engaged in substantial gainful activity since July 26, 2004, which is her alleged date of disability onset. (R. 19). In reaching his decision that the claimant's anxiety and depression are not severe enough to meet the listing requirements, the ALJ gave great weight to the state agency medical consultant's opinions, and little weight to Dr. Gandhi's opinion, because Dr. Gandhi is not a mental health specialist. (R. 20). The ALJ also noted that Dr. Freeman did not report that the claimant had any mental problems until late in 2006, and that the treating physician Dr. Hunt never reported any mental health problems. *Id*. The ALJ stated that he considered the medical evidence of record in totality in reaching his decision. *Id*.

Next, the ALJ found that the claimant had severe impairments, including fibromyalgia, arthritis, pain, and bulging disks. (R. 19). However, he found that the claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments, even though they are severe. (R. 20). The ALJ accepted the treating physicians' opinions as to the claimant's physical ailments, and noted that the evidence showed that she had the conditions with which they diagnosed her, but did not find the claimant's representations "regarding the intensity, persistence, and limiting effects of [the] symptoms entirely credible."

(R. 23).

The ALJ then concluded that the claimant has the residual capacity to do light work. (R. 21). He defined light work as work that requires lifting twenty pounds on occasion, frequently lifting or carrying objects weighing ten pounds, and standing and/or walking for six hours in an eight-hour shift and sitting for the remainder of the time. *Id.* Also, light work precludes climbing ladders, ropes or scaffolds as well as avoiding exposure to hazardous machinery and heights. *Id*. Considering all of the available medical evidence regarding the claimant's back pain and fibromyalgia, the ALJ found that the claimant's allegations of disability were only partially credible to the extent that they would limit her to light work. (R. 22-23).

A vocational expert testified at the hearing as to jobs that the claimant can perform. (R. 233-236). In the past, the claimant was a nurse's assistant in a nursing home, a resident assistant in an assisted living facility, a production assembler for a compressor manufacturer, and an order picker for a distribution center. (R. 234). In her testimony, the VE classified the order picker position and the production assembler position as light, the resident assistant position as medium, and the nurse's assistant position as heavy because of the way in which the job was performed. (R. 235).

The ALJ posed a hypothetical to the VE, asking that, if the full range of light work restrictions were imposed on the claimant, could the claimant perform any of these past relevant jobs. (R. 235). The VE replied that the claimant could still perform the production assembler job. *Id*. The ALJ then asked the VE if the claimant could still perform the production assembler job if she had moderate limitations in activities of daily life, social functioning, concentration, persistence, and pace, and the VE said that the claimant would still be able to perform the job.

*Id*.  The ALJ then found that the claimant can perform her past relevant work as a production assembler.  (R. 23).

After the ALJ issued the hearing decision, the claimant filed for Appeals Council review on May 8, 2007.  (R. 10-11).  The claimant submitted additional medical records on February 27, 2008, consisting of the radiologist's report of a CT scan of her spine, and Dr. Fuller's records, noted above.  (R. 216-220).  On the same day, the Appeals Council denied the claimant's request for review.  (R. 4-7).  This denial made the Commissioner's decision final, and the claim is now ripe for review by this court.

## VI. Discussion

**Whether the claimant's lateral disk protrusion was ever considered under the listing for spinal disorders.**

The claimant asserts that the ALJ never considered her disk protrusion under the listing for spinal disorders.  The claimant has the burden of providing substantial evidence as to the first three steps of the process discussed above. *See Jones,* 190 F.3d at 1228.  Once a condition is considered severe under the second step of the disability determination process, the third step is to determine if the condition meets a listing.  20 C.F.R. § 404.1525.  For a spinal disorder, the appropriate listing to consider is found in section 1.04.

The ALJ noted in his opinion that none of the claimant's severe impairments met or exceeded the listing requirements.  (R. 20).  Further, he specifically stated that the claimant's impairments did not meet the requirements of listing 1.04, which is the listing for spinal disorders.  *Id.*  Given that statement, this court cannot say that the ALJ did not consider the spinal disorder under listing 1.04 at all, but the ALJ was not explicit as to exactly why he found that the

claimant did not meet listing 1.04. However, the ALJ did not have the April 2007 CT report that provided additional evidence of the extent of the disk protrusion. The evidence of record seems to demand a closer look at the facts to determine if the claimant's condition - taking into account the disk protrusion - might actually meet the listing. Therefore, this court finds that further examination of the evidence surrounding the back pain claim is in order.

The applicable section of listing 1.04, subpart A, requires that the claimant's spinal disorder impairment result in compromise of the nerve root or the spinal cord. It must also have the following characteristics to be considered a disabling impairment:

> Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine). 20 C.F.R. Part 404, Subpt. P, App. 1, Listing 1.04(A).

Again, the claimant bears the burden of showing, with substantial evidence, that her impairment meets or exceeds the listing requirements. Dr. Gandhi's records as well as the May 2006 MRI report are evidence enough to question the ALJ's finding that the claimant did not make a prima facie case that she meets the requirements of listing 1.04.

These two records tend to show that the claimant may meet the listing requirements. Overall, a spinal impairment must involve some impairment or compromise of the spinal cord. The MRI report from May 2006 showed foraminal stenosis and lateral recess stenosis at L1-2, which is a narrowing of the spaces in the spinal cord that can compromise nerves and nerve roots. The listing also requires nerve root compression, which is evidenced by pain, limitation of motion of the spine, and motor loss. In addition, the listing requires a positive straight leg test if

"there is involvement of the lower back."

Dr. Gandhi reported mild to moderate muscle tenderness in the lower spine as well as trigger point tenderness, which suggests the claimant's condition could meet the pain requirement. The claimant told Dr. Gandhi that at times her back pain radiates to her right knee, which could mean that something is pressing on a nerve root in her lower back. Dr. Gandhi also noted that the claimant had some loss of motion of her lower spine. Motor loss, according the listing, is shown by "atrophy with associated muscle weakness or muscle weakness accompanied by sensory or reflex loss." Dr. Gandhi's evaluation indicates that the claimant can stoop and squat, but it causes her pain, and she also has stiffness and soreness in her back that requires her to change sitting or standing positions frequently. Finally, Dr. Gandhi reported a positive straight-leg raising test result in the 65 to 70 range, which meets the positive straight leg test requirement in the listing. Given Dr. Gandhi's records and the May 2006 MRI report, the claimant seems to have made a prima facie case that she meets listing 1.04.

Of further significance is the April 2007 CT report. The court notes that on the same day the claimant forwarded this record to the Appeals Council, her claim was denied, making the ALJ's decision final. Whether the Council considered this record before denying the claim is not discernable, but this medical record demands consideration, as it is further evidence that the claimant's spinal condition meets the listing requirements. Specifically, the radiologist reported a left lateral disk protrusion that effaces the thecal sac and fills the nerve root at L3-4, and a broad based disk bulge and facet hypertrophy at L4-5. (R. 216). The fact that the protrusion at L3-4 seems to compromise the nerve root further convinces the court that the disk bulges are worth a second look to determine if they meet the requirements of listing 1.04.

On appeal, this court is to determine if the Commissioner applied the correct legal standards and if his factual conclusions are supported by substantial evidence. In this case, the court does not find that the Commissioner's decision is supported by substantial evidence, as the medical evidence provided by the claimant suggests that her spinal condition may meet the listings.

Because the court is remanding the case for reconsideration on the spinal condition issue, it need not reach the claimant's other issues on appeal.

### VII. Conclusion

For the reasons stated, the court REMANDS the Commissioner's decision for further consideration. The court will enter a separate order consistent with this opinion.

DATED this 12th day of August, 2009.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE